IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| SEBASTIAN CARPENTER, | CASE NO. 5:24-cv-1085 |
| Plaintiff, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Sebastian Carpenter filed a Complaint against the

Commissioner of Social Security seeking judicial review of its decision denying

childhood disability and supplemental social security income benefits. Doc. 1.

This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court

referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the

preparation of a Report and Recommendation. Following review, and for the

reasons stated below, I recommend that the District Court affirm the

Commissioner's decision.

**Procedural Background**

In October 2021, Carpenter filed an application for Childhood Disability

and Social Security Disability Insurance benefits, alleging a disability onset

date in December 2019.[1] Tr. 294–307. Carpenter alleged disability relating to lower back and hip pain, migraines, insomnia, asthma, heart murmur, chronic fatigue, frequent yeast infections, endometriosis, major depressive disorder, post-traumatic stress disorder (PTSD), and autism. Tr. 319. The Commissioner denied Carpenter's application initially and on reconsideration. Tr. 135, 172, 192.

In August 2022, Carpenter requested a hearing. Tr. 206. Administrative Law Judge ("ALJ") Michael F. Schmitz conducted a telephonic hearing in March 2023. Tr. 102. Carpenter appeared, testified, and was represented by counsel at the hearing. *Id.* Qualified vocational expert William Cody also testified. Tr. 128. In April 2023, the ALJ issued a written decision, which found that Carpenter was not entitled to benefits. Tr. 66.

In June 2023, Carpenter appealed the ALJ's decision to the Appeals Council. Tr. 289. In April 2024, the Appeals Council denied Carpenter's appeal, Tr. 1, making the ALJ's April 2023 decision the final decision of the Commissioner, Tr. 102–32, *see* 20 C.F.R. § 404.981.

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

**Evidence**[2]

*1.  Personal, Education, Vocational*

Carpenter was born in 2001, making him 18 years old on his alleged onset date. Tr. 94, 294. He attended high-school until the 12th grade and received his GED in 2020. Tr. 113, 320.

*2.  Medical Evidence*

In January 2021, Carpenter saw Erin Tisdale, APRN,[3] to address his longstanding gender dysphoria and discuss medical/hormonal transition." Tr. 563. Nurse Tisdale indicated that Carpenter's mood, behavior, thought content, and judgment were all normal. Tr. 566. Nurse Tisdale also prescribed testosterone injections at this appointment. Tr. 567. Through at least 2023, Carpenter had periodic follow-up appointments with Nurse Tisdale and continued to take testosterone. *See, e.g.*, Tr. 571, 578, 586, 781, 791, 958. At all follow-up appointments, Nurse Tisdale documented normal objective findings on mental status examinations. *See, e.g.*, Tr. 574, 582, 590, 785, 795, 963.

In May 2021, Alf Bergman, MD, treated Carpenter over a period of three days when he was hospitalized for suicidal ideation and an overdose, which

---

[2]    The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs.

[3]    APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html    [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id.*

was described as a suicide attempt. Tr. 385–98. Three days after admission, Carpenter was discharged when his "symptoms improved and stabilized" with "no acute safety concerns" and "an improvement in state or status of risk of suicide compared to the admission." Tr. 385.

Providers at Coleman Behavioral Health treated Carpenter from June 2021 through at least April 2022. Tr. 492–562, 681–83. In June 2021, Tina Steen, CNP, diagnosed Carpenter with depressive disorder, generalized anxiety disorder, and PTSD, and she restarted Carpenter on medications. Tr. 532–34. In July 2021, at follow up psychiatric care appointments, Nurse Steen adjusted Carpenter's medications. *See* Tr. 535, 539, 542, 546.

Also in July 2021, Susanne Bond, APRN-CNP, noted that Carpenter reached out and asked her to restart his ADD medication. Tr. 435. Nurse Bond explained that she was uncomfortable prescribing a stimulant at that time and advised Carpenter to discuss the matter with his new psychiatrist. Tr. 435.

In September 2021, Michael Ray, MS, treated Carpenter on admission to a hospital for suicidal thoughts and feelings of hopelessness. Tr. 399. Dr. Ray noted that Carpenter was homeless at the time of his admission. Tr. 399. With "minor medication adjustments and supportive educative counseling," Carpenter stabilized and expressed a willingness to restart outpatient counseling. Tr. 399–400.

In October 2021, Carpenter underwent counseling services through Coleman Behavioral Health. Tr. 496–507.

In November 2021, Allison Harrison, a school psychologist, evaluated Carpenter and found that "early results of testing thus far suggests symptomology associated with Autism Spectrum Disorder." Tr. 466–67. She also noted that the evaluation was "ongoing as additional testing was requested by this client[.]" Tr. 466–67. Harrison conducted additional evaluations in December 2021 and March 2022, culminating in a June 2022 report with overall findings that "suggest[ed]" that Carpenter "demonstrates characteristics aligned with Autism Spectrum Disorder." Tr. 693.

Later in November 2021, Ryan Goettsch, LISW,[4] conducted an adult diagnostic assessment of Carpenter. *See* Tr. 475–82. Carpenter reported recurrent intrusive memories, dissociative episodes, self-sabotaging, depersonalization, and derealization. Tr. 478–79. Mr. Goettsch diagnosed Carpenter with PTSD and noted a need to "rule out" diagnoses of depression, ADHD, and autism spectrum disorder. Tr. 481.

In March 2022, Kassandra Kornbau, DNP, APRN, FNP,[5] noted that Carpenter reported "feeling okay," though he also reported increased

---

[4]   The acronym LISW stands for "Licensed Independent Social Worker" which is a designation obtained after completion of a master's level education and other training requirements established by state licensing boards. National Association of Social Workers Washington Chapter, *Licensed Independent Social Workers (LISW) Overview*, https://careers.naswwa.socialworkers.org/career/licensed-independent-social-worker-lisw **[**https://perma.cc/4N5N-6HXL**]**.

[5]   The acronyms DNP and FNP stand for "Doctor of Nursing Practice" and "Family Nurse Practitioner," respectively. An FNP is an APRN with educational and training focused on family practice, while a DNP is the most

depression and suicidal ideation, but not intent, the previous evening. Tr. 720. Kornbau advised Carpenter to "call hotline, office, 911 or go to ER if having thoughts of self harm" and that he should continue taking his prescribed medications, Zoloft and Buspar, because "symptoms may improve once other meds take full effect." Tr. 728.

In July 2022, Kyle Guterba, CNP, conducted a medication management appointment and recorded that Carpenter was content with his medications and that his hallucinations were well managed. Tr. 710. He noted that Carpenter denied mood swings and overt depression or anxiety, though Carpenter described continued struggles with focus, concentration, and staying on task. *Id.* He also reported that Carpenter had intact judgment and insight, appropriate speech and thought processes, and an appropriate affect and mood. Tr. 713–14. Nurse Guterba also prescribed Vyvanse. Tr. 718. During an August 2022 appointment, Carpenter described that "his focus [wa]s better since starting the [V]yvanse last month, but [that] he [wa]s still getting distracted." Tr. 701.

The most recent records from Comprehensive Behavioral Health Associates, show that in February and March 2023, Carpenter continued to respond to treatment provided. Tr. 873, 875, 949. Providers reported that Carpenter denied suicidal thoughts and stated that "things had been going

---

advanced degree available for nurse practitioners. Franklin University, FNP vs. DNP.: The Definitive Comparison, https://www.franklin.edu/blog/fnp-vs-dnp [https://perma.cc/LXW7-6LLH].

alright." Tr. 873, 949. Carpenter also stated that his medications were "working well" and that "overall moods ha[d] been stable" and his depression, anxiety, and attention and focus issues were all well controlled. Tr. 949–50.

### 3. State Agency Reviewers

In January 2022, state agency psychological reviewer Robyn Murry-Hoffman, Psy. D, reviewed the record and found that Carpenter had no more than moderate limitations in the four broad areas of mental functioning. 139–41. Dr. Murry-Hoffman concluded that Carpenter could work in "a non-public work environment in which interaction with coworkers and supervisors is occasional and superficial," where there were no more than occasional changes in routine which were predictable and easily explained, and where tasks were not production driven. Tr. 140–41. In March 2022, Kristen Haskins, Psy. D, found that the initial assessment "remains appropriated on reconsideration, and is affirmed. Findings are consistent and supported by the medical and nonmedical findings." Tr. 157–60.

### 4. Hearing Testimony

Carpenter testified during the administrative hearing that he lived on his own but that he had providers who came to his home to help him. Tr. 112–13. He also explained that, although he could not drive, he had medical transportation provided by the state. Tr. 113.

Carpenter described that he worked in a vocational workshop run by the Board of Developmental Disabilities and that he was generally scheduled to work between 12 and 20 hours per week. Tr. 114. At the vocational workshop

program, he was assigned as a document shredder. *Id.* Later during his testimony, Carpenter stated that he did not go into work regularly and that there were no repercussions for being absent. Tr. 124. He said he would typically go in three or four days in a good week but that in a bad week he might go in only two times. *Id.* Carpenter also explained that workshop workers could take six breaks in a four- or five-hour shift, but that sometimes he took more. Tr. 125. He testified that his team had recently decided that, due to recent mental-health struggles, he was not ready to advance to the next level of employment services. *Id.*

### 5. *Vocational Expert*

Qualified vocational expert William Cody, testified that there would be jobs in the national economy for a hypothetical individual with Carpenter's residual functional capacity (RFC).[6] Tr. 130–31. Cody also testified that a hypothetical individual with the same RFC, but that also required occasional redirection or supervision to stay on task, would eventually be precluded from sustained employment. Tr. 131. He testified further that if an individual were absent from work more than once per month, no jobs would exist for that person to perform. Tr. 132.

---

[6]     An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

**ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1.  Born on December 27, 2001, the claimant had not attained age 22 as of December 27, 2019, the alleged onset date (20 CFR 404.102, 416.120(c)(4), and 404.350(a)(5)).

2.  The claimant has not engaged in substantial gainful activity since December 27, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: depressive disorder, schizoaffective disorder, anxiety disorder, borderline personality disorder, autism spectrum disorder, attention-deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual capacity to perform medium work, as defined in 20 CFR 404.1567(c) and 416.967(c), except that he is further limited in the following nonexertional respects:

    -   Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs, and can frequently balance, stoop, crouch, kneel, and crawl;

9

- Must avoid all exposure to hazards such as unprotected heights; and
- Can perform a wide variety of both simple and complex tasks, but cannot perform tasks that require a high production rate pace (such as assembly-line work); can interact on an occasional basis with supervisors and coworkers in a non-public work setting, and is limited to superficial contact, meaning no group, tandem, or collaborative tasks and no management, direction, or persuasion of others; and can respond appropriately to occasional change in a routine and relatively predictable work setting, as long as any such change is easily explained and/or demonstrated.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on December 27, 2001 and was 18 years old, which is defined as a younger individual age 18—49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416. 964).

9. Transferability of job skills is not an issue because claimant does not have past relevant work (20 CFR 404.1568 and 416.958).

10. Considering the claimant's age, education, no work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from

10

> December 27, 2019 through the date of this
> decision (20 CFR 404.350(a)(5), and
> 404.1520(g), and 416.920(g)).

Tr. 72–3, 79, 94

### Standard for Disability

Eligibility for social security benefit payments depends on the existence

of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the

"inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected

to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

§ 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a

disability determination:

> 1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not

11

> disabled. If not, the ALJ proceeds to the next
> step.
>
> 5.    Can the claimant do any other work
> considering the claimant's residual functional
> capacity, age, education, and work
> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d

417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the

burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden

shifts to the Commissioner at step five "to prove the availability of jobs in the

national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional

capacity." *Id*. If a claimant satisfies each element of the analysis and meets the

duration requirements, the claimant is determined to be disabled. *Walters

Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of Review

A reviewing court must affirm the Commissioner's conclusions unless it

determines "that the ALJ has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record."

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which

"a court … asks whether" the "existing administrative record … contains

'sufficien[t] evidence' to support the agency's factual determinations." *Biestek

v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial

evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than

a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Carpenter asserts that the ALJ's findings "lack[] the support of substantial evidence because the ALJ erred in his analysis of the evidence from [Carpenter's] medical providers and vocational services providers." Doc. 8, at 1. For at least the three following reasons, Carpenter's argument that ALJ's decision is not supported by substantial evidence fails.

13

*First*, to the extent that Carpenter's argument can be construed as taking issue with the ALJ's analysis of the medical evidence by asserting that the ALJ "erred in his analysis of the evidence from [Carpenter's] medical providers," Doc. 8, at 1, 8, his argument is unconvincing. The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as

14

set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at \*14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Without citing any of the above authority, Carpenter advances an argument that the ALJ "made mistakes and omissions in his analysis." Doc. 8, at 7–8 (citing only authority establishing the scope of judicial review and the substantial evidence standard). Carpenter makes no argument that the ALJ failed to articulate why he found certain medical evidence  persuasive or unpersuasive. Doc. 8, at 8–9. (citing evidence that supported an outcome different than the ALJ's determination). He also does not argue that the ALJ failed to discuss the supportability and consistency of the medical evidence. *See id.* And, even if he had, the ALJ's decision belies that argument. *See* Tr. 91–93 (specifically addressing the persuasiveness of the medical opinions by articulating supportability and consistency factors). Carpenter's failure to provide any support, from the record or otherwise, to show that the ALJ's analysis fell below the requirements for evaluating medical opinion evidence undercuts his argument that the ALJ erred in evaluating that evidence.

*Second*, the bulk of Carpenter's brief, three-page argument is simply an overview of the evidence that he views as supporting a different outcome.[7] *See*

---

[7]    Carpenter points out that the ALJ's RFC assessment did not include a limitation for his absenteeism or alleged need for additional supervision. Doc. 8, at 8. But Carpenter does not provide any support for or clear argument that the exclusion of these limitations justifies remand.

Doc. 8, at 8–9. Carpenter does not provide *any* reason why the ALJ's decision is *not* supported by substantial evidence. *Id.* This omission matters because "so long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). So whether—as Carpenter says—"[s]ubstantial evidence supports a finding of disability, based on the evidence outlined above, and based on the testimony of the vocational expert[,]" Doc. 8, at 10, is irrelevant unless he shows that substantial does *not* support the ALJ's decision, *see Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004). Beyond saying that "the ALJ's determination lacks the support of substantial evidence," Doc. 8, at 10, Carpenter does nothing to substantiate his claim, *see Hunter v. Ferebauer*, 980 F. Supp. 2d 1251, 1259 (E.D. Wash. 2013) (holding that a "conclusory" statement "establishes nothing more than the fact that" the person making the assertion "had that belief"). Carpenter has thus forfeited any argument that the ALJ's decision is unsupported by substantial evidence. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").

Moreover, the ALJ's decision is supported by substantial evidence. In addition to other detailed analysis, the ALJ provided an extensive summary of

the relevant objective medical records and specifically explained why his findings were supported by those record. *See* Tr. 82–87. For example, at the conclusion of his analysis for one portion of the evidence, the ALJ wrote that the "medical evidence again shows that [Carpenter's] symptoms of PTSD, depressive disorder, and anxiety disorder respond well to medications and added therapies, and there remains no significant report of significant features relating to previously diagnosed borderline personality disorder or later diagnosed schizoaffective disorder and autism within these records." Tr. 85. Elsewhere, the ALJ distinguished that "the summary pages provided by [Carpenter's primary counseling provider] do not support any significant absences from scheduled appointments or attendance issues, which tend against the testimony alleging that his symptoms at times affect his ability to consistently attend these appointments[.]" Tr. 87. And these are just some examples, which Carpenter ignores, that demonstrate the ALJ's decision that show substantial evidence supports his decision.

The District Court should thus affirm the Commissioner's decision.

*Third*, and finally, Carpenter makes a passing claim that "[t]he evidence supports a finding of disability at the fifth step of the sequential evaluation process, if not at the third." Doc. 8, at 9. But he does not further develop this argument. There is also no indication from Carpenter's issue statement or argument heading that Carpenter challenges the ALJ's analysis at any particular step in the sequential evaluation. So, in this regard, Carpenter

17

failed to comply with the Court's initial order. *See* Doc. 4, at 3 ("Each introductory heading in the Argument or Analysis section of a brief must correspond to the argument presented under the heading. Failure to comply with this requirement may result in (a) waiver of the arguments in the heading and in the test following the heading[.] … Similarly, bald assertions of error—those unsupported by explanation and argument—will be deemed waived."). In either event, this argument, if it can be considered one, is also forfeited. *See McPherson*, 125 F.3d at 995–96. Carpenter's final, passing argument should therefore also be rejected.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: January 29, 2025

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th